

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 2 0 2009 ★

BROOKLYN OFFICE

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SUSAN MACDONALD, individually and on behalf of all others similarly situated , | ) ) ) | Civil Action No. **09 1172** |
| Plaintiff, | ) ) | |
| v. | ) ) | CLASS ACTION COMPLAINT |
| ACE AVIATION HOLDINGS INC.,AEROLÍNEAS BRASILEIRAS S.A. dba ABSA CARGO AIRLINE, AIR CANADA, AC CARGO LP, AIR FRANCE ADS, AIR FRANCE-KLM GROUP ADS, AIR FRANCE CARGO ADS, AIR FRANCE-KLM CARGO ADS, ALL NIPPON CARGO AIRLINES COMPANY, LTD., AMR CORPORATION, AMERICAN AIRLINES, INC., ASIANA AIRLINES, BRITISH AIRWAYS PLC, CARGOLUX AIRLINES INTERNATIONAL S.A., CATHAY PACIFIC AIRWAYS LTD., DEUTCHE LUFTHANSA AG, LUFTHANSA CARGO AG, EL AL ISRAEL AIRLINES, LTD., EMIRATES AIRLINES d/b/a EMIRATES, JAPAN AIRLINES INTERNATIONAL COMPANY LTD., KOREAN AIRLINES COMPANY LTD., LAN AIRLINES S.A., LAN CARGO S.A., MARTINAIR HOLLAND N.V., AIRWAYS CORPORATION OF NEW ZEALAND LIMITED d/b/a AIRWAYS NEW ZEALAND, QANTAS AIRWAYS LIMITED, SAUDI ARABIAN AIRLINES, LTD., SAS AB dba. SAS GROUP, SAS CARGO GROUP A/S, SINGAPORE AIRLINES LIMITED, SINGAPORE AIRLINES CARGO PTE LIMITED, SOUTH AFRICAN AIRWAYS (PROPRIETARY) LIMITED, SWISS INTERNATIONAL AIRLINES LTD., THAI AIRWAYS INTERNATIONAL PUBLIC CO. LTD., VIAÇÃO AÉREA RIO-GRANDENSE, S.A and JOHN DOES I-X, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | <u>JURY TRIAL DEMANDED</u><br><br>**BLOCK, J.**<br><br>**GOLD, M.J.** |
| Defendants. | ) ) | |

445195.1 1

1.     Plaintiff Susan MacDonald ("Plaintiff"), by and through her undersigned counsel, complains and alleges upon information and belief except as to those paragraphs applicable to her, which are based on personal knowledge, as follows.

## DEFINITIONS

2.     "Airfreight Carrier" means any airline acting as an Airfreight Shipping Services provider.

3.     "Airfreight Shipping Services" means paid, private air transport of freight or other cargo by Airfreight Carriers.

4.     "Airfreight Customer" means any person or entity purchasing Airfreight Shipping Services, excluding Defendants or any predecessor, subsidiary, or affiliate of each.

5.     "Cartel" means the combination of Airfreight Carriers named herein that conspired to fix, raise, maintain, and/or stabilize the prices of Airfreight Shipping Services.

6.     "Class Period" refers to the period from January 1, 2000 to the present.

7.     "Surcharge" means a fee charged to an Airfreight Customer, in addition to Airfreight Shipping Services base rates, purportedly to compensate the Airfreight Carrier for certain external costs.

8.     "Fuel Surcharge" means a Surcharge levied by an Airfreight Carrier upon Airfreight Customers purportedly to compensate the Airfreight Carrier for costs of fuel.

9.     "Security Surcharge" means a Surcharge levied by an Airfreight Carrier upon an Airfreight Customer purportedly to compensate the Airfreight Carrier for costs

associated with security measures implemented after the terrorist attacks in the United States on September 11, 2001 (hereinafter "September 11 attacks").

10.     "War Risk Surcharge" means a Surcharge levied by an Airfreight Carrier upon an Airfreight Customer purportedly to compensate the Airfreight Carrier for costs of war-risk insurance premiums and flight rerouting necessary in conjunction with the outbreak of war in Iraq in 2003.

11.     "U.S. Customs Surcharge" means a Surcharge levied by an Airfreight Carrier upon an Airfreight Customer purportedly to compensate the Airfreight Carrier for costs associated with preparation of and electronic submission to U.S. Customs of a manifest of the freight that the Airfreight Carrier will offload in the United States.

12.     "Undertaking" shall have the meaning ascribed to it by the EC Treaty, i.e., any entity engaged in an economic activity, which is an activity consisting of offering goods or services on a given market, regardless of the entity's legal status and the way in which it is financed.

## NATURE OF THE ACTION

13.     This action arises from Defendants' massive, global conspiracy to fix, raise, maintain, and/or stabilize prices of Airfreight Shipping Services through a number of mechanisms, including, *inter alia*, concertedly levying inflated surcharges, jointly agreeing to eliminate or prevent discounting of Airfreight Shipping Services prices, agreeing on yields, and allocating customers.

14.     Defendants and their co-conspirators acted in concert pursuant to a single, overarching conspiracy to artificially inflate the prices of Airfreight Shipping Services.

15.     Plaintiff, on behalf of herself and all persons and entities that purchased Airfreight Shipping Services for shipments within, to, or from the United States directly

2

from any of the Defendants or any predecessor, subsidiary, or affiliate of each, at any time during the period from no later than January 1, 2000 to the present (the "Class"), brings this action:

        a.     to recover treble damages and injunctive relief for violations of Section 1 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. § 1 pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15, 26; and

        b.     to recover injunctive relief for violations of the Sherman Act and to recover damages and/or restitution as allowed by law for violations of the applicable State antitrust, consumer protection and unfair competition laws, and under common law for unjust enrichment.

## JURISDICTION AND VENUE

16.     This Complaint is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

17.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

18.     This Court has *in personam* jurisdiction over each of the Defendants because each was engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused injury to persons and entities residing in, located in, or doing business in this district and throughout the United States.

19.     Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. §1391(b), (c), and (d), because

during the Class Period one or more of the Defendants resided, transacted business, were found, or had agents in this district, a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

**DEFENDANT PARTIES**

20.    Defendant ACE Aviation Holdings, Inc. ("ACE") is a foreign company with its headquarters located at 5100 de Maisonneuve Boulevard West, Montreal, Quebec H4A 3T2, Canada.  Air Canada conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  ACE is the parent company of defendant Air Canada.

21.    Defendant Air Canada is a foreign company with its headquarters located at 5100 de Maisonneuve Boulevard West, Montreal, Quebec H4A 3T2, Canada.  Air Canada conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

22.    Defendant AC Cargo LP ("AC Cargo") is a foreign company with its headquarters located at 5100 de Maisonneuve Boulevard West, Montreal, Quebec H4A 3T2, Canada.  AC Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  At all relevant times, Air Canada owned, dominated and controlled the businesses of AC Cargo.

23.    Defendants identified in paragraphs 20 through 22 are collectively referred to herein as the "Air Canada Defendants."

24.    Defendant Air France ADS ("Air France") is a foreign company with its headquarters located at 45, rue de Paris 95747 Roissy-CDG Cedex, France.  Air France conducts Airfreight Shipping Services throughout the world, including in the U.S. and

4

this district. Air France is a subsidiary of air France-KLM Group ADS. On information and belief, at all relevant times, the business of Air France was owned, dominated and controlled by Air France-KLM Group ADS.

25.     Defendant Air France-KLM Group ADS ("Air France-KLM") is a foreign company with its headquarters located at 45, rue de Paris 95747 Roissy-CDG Cedex, France. Air France-KLM conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

26.     Defendant Air France Cargo ADS ("Air France Cargo") is a foreign company with its headquarters located at 45, rue de Paris 95747 Roissy-CDG Cedex, France. Air France Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

27.     Defendant Air France-KLM Cargo ADS ("Air France-KLM Cargo") is a foreign company with its headquarters located at 45, rue de Paris 95747 Roissy-CDG Cedex, France. Air France-KLM Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

28.     Defendants identified in paragraphs 24 through 27 are collectively referred to herein as the "Air France Defendants."

29.     Defendant Aerolíneas Brasileiras S.A. d/b/a ABSA Cargo Airline ("ABSA") is a foreign company with its headquarters located at Aeroporto Internacional de Viracopos, Rodovia Santos Dumont, Km 66 - Sistema Viário Principal s/no, 13051-970 Campinas São Paulo, Brazil. ABSA conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. ABSA has a strategic alliance with Defendant LAN Cargo S.A. (LAN Airlines S.A. owns 73 percent of ABSA)

5

and maintains a code-share agreement with Defendant Lufthansa Cargo to and from Frankfurt.

30.    Defendant All Nippon Airways Co., Ltd. ("ANA") is a foreign company with its headquarters located at Shiodome City Center, 1-5-2 Higashi-Shimbashi, Minato-ku, Tokyo 105-7133, Japan. ANA conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. Until 2005 ANA owned at least 25% of Defendant All Nippon Cargo Airlines.

31.    Defendant AMR Corporation is a Delaware corporation with its principal place of business at 433 Amon Carter Boulevard, Fort Worth, Texas. AMR Corporation conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

32.    Defendant American Airlines, Inc. is a Delaware corporation with its principal place of business at 433 Amon Carter Boulevard, Fort Worth, Texas. American Airlines, Inc., a subsidiary of AMR Corporation, conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

33.    Defendants identified in paragraphs 31 through 32 are collectively referred to herein as "American."

34.    Defendant Asiana Airlines Inc. ("Asiana Airlines") is a foreign company with its headquarters located at Asiana Twon Kangseo, P.O. Box 98 #47, Osae-Dong, Kangseo-Ku, Seoul, South Korea. Asiana conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

35.    Defendant British Airways PLC ("British Airways" or "British") is a foreign company with its headquarters located at Waterside, UB7 GB Harmondsworth,

6

Middlesex, England. British Airways conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. British Airways' cargo division is named British Airways World Cargo.

36.     Defendant Cargolux Airlines International S.A. ("Cargolux") is a foreign company with its headquarters located at Luxembourg Airport L-2990, Luxembourg, Grand Duchy of Luxembourg. Cargolux conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

37.     Defendant Cathay Pacific Airways Ltd. ("Cathay Pacific") is a foreign company with its headquarters located at Hong Kong International Airport, 7/F North Tower, 8 Scenic Road, Cathay City, Lantau, Hong Kong. Cathay Pacific conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

38.     Defendant Deutsche Lufthansa AG ("Lufthansa AG") is a foreign company with its headquarters located at Von-Gablenz-Strasse 2-6, 50679 Köln, Germany. Lufthansa AG conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

39.     Defendant Lufthansa Cargo AG ("Lufthansa Cargo") is a foreign company with its headquarters located at Von-Gablenz-Strasse 2-6, 50679 Köln, Germany. Lufthansa Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. Lufthansa Cargo is a subsidiary of Lufthansa AG. At all relevant times, Lufthansa AG owned, dominated and controlled the business of Lufthansa Cargo.

40.     Defendant Swiss International Air Lines Ltd. ("Swiss International") is a foreign company and is a wholly-owned subsidiary of Lufthansa AG, with its

7

headquarters located at Aeschenvorstadt 4, CH-4051 Basel, Switzerland. Swiss International conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

41.     Defendants identified in paragraphs 38 through 40 are collectively referred to herein as the "Lufthansa Defendants," or "Lufthansa."

42.     Defendant El Al Israel Airlines, Ltd. ("El Al") is a foreign company with its headquarters located at Ben Gurion International Airport, P.O. Box 41, Lod 70100, Israel. El Al conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

43.     Defendant Emirates Airlines d/b/a Emirates ("Emirates") is a foreign company with its headquarters located at Ground Floor, Dubai Airline Centre Building, Dubai, United Arab Emirates. Emirates conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

44.     Defendant Japan Airlines International Company Ltd. ("JAL") is a foreign company with its headquarters located at 4-11, Higashi-shinagawa 2-chome, Shinagawa-ku, Tokyo 140-8637, Japan. JAL conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. JAL's cargo division is named JAL Cargo.

45.     Defendant Korean Air Company, Ltd. ("Korean Air") is a foreign company with its headquarters located at 1370 Gonghang-Dong, Gangso-Gu, Seoul, Korea. Korean Air conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

46.     Defendant LAN Airlines S.A. ("LAN Airlines") is a foreign company with its headquarters located at Presidente Riesco 5711 Piso 20, Las Condes, Santiago, Chile.

8

LAN conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

47.     Defendant LAN Cargo S.A. ("LAN Cargo") is a foreign company with its headquarters located at Presidente Riesco 5711 Piso 20, Las Condes, Santiago, Chile. LAN Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.   LAN Cargo is a wholly owned subsidiary of LAN.  At all relevant times, LAN owned, dominated and controlled the business of LAN Cargo.

48.     Defendants identified in paragraphs 46 through 47 are collectively referred to herein as the "LAN Defendants."

49.     Defendant Martinair Holland N.V. ("Martinair") is a foreign company with its headquarters located at Martinair Bldg., Schiphol Airport, 1118 ZG Amsterdam, The Netherlands.  Martinair conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  Defendant KLM owns 50 percent of Martinair.

50.     Defendant Airways Corporation of New Zealand Limited d/b/a Airways New Zealand ("New Zealand Air") is a foreign company with its headquarters located at 44-48 Willis Street, Wellington, New Zealand.  New Zealand Air conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

51.     Defendant Qantas Airways Limited ("Qantas") is a foreign company with its headquarters located at Qantas Centre, 203 Coward Street, Mascot New South Wales 2020. Qantas conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

52.     Defendant Saudi Arabian Airlines, Ltd. ("Arabian") is a foreign company with its headquarters located at P.O. Box 167, Jeddah 21231, Kingdom of Saudi Arabia.

Arabian conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

53.     Defendant SAS AB d/b/a SAS Group ("SAS Group") is a foreign company with its headquarters located at Frösundaviks Allé 1, 195 87 Stockholm, Sweden.  SAS conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

54.     Defendant SAS Cargo Group A/S ("SAS Cargo") is a foreign company with its headquarters located at Frösundaviks Allé 1, 195 87 Stockholm, Sweden.  SAS Cargo, a subsidiary of SAS Group, conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  On information and belief, at all relevant times, SAS Group owned, dominated and controlled the business of SAS Cargo.

55.     Defendants identified in paragraphs 53 through 54 are collectively referred to herein as the "SAS Defendants."

56.     Defendant Singapore Airlines Limited ("Singapore Airlines") is a foreign company with its headquarters located at Airline House, 25 Airline Road, Singapore 819829.  Singapore Airlines conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

57.     Defendant Singapore Airlines Cargo Pte Ltd. ("SIA Cargo") is a foreign company with its headquarters located at 5th floor core L, SATS Airfreight Terminal 5, Superhub 1, 30 Airline Road, Singapore 819830.  SIA Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  SIA Cargo is a wholly owned subsidiary of Singapore Airlines.  At all relevant times, Singapore Airlines owned, dominated and controlled the business of SIA Cargo.

10

58.     Defendants identified in paragraphs 56 through 57 are collectively referred to herein as the "Singapore Air Defendants."

59.     Defendant South African Airways (Proprietary) Limited ("SAA") is a foreign company with its headquarters located at Airway Park, Jones Road, Johannesburg International Airport, Kempton Park Johannesburg, 1627, South Africa.  SAA conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

60.     Defendant Thai Airways International Public Co., Ltd. ("Thai") is a foreign company with its headquarters located at 89 Vibhavadi-Rangsit Rd. Bangkok, 10900, Thailand.  Thai conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

61.     Defendant Viação Aérea Rio-Grandense, S.A. ("VARIG") is a foreign company with its headquarters located at Rua 18 de Novembro No. 800, São João, 90240-040 Porto Alegre, Rio Grande do Sul, Brazil.  VARIG conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

62.     At all relevant times hereto, Defendants were Airfreight Carriers that charged Airfreight Shipping Services base rates, Surcharges, and other fees to Airfreight Customers in the United States and throughout the world.

63.     As further alleged herein, during at least the Class Period, Defendants agreed, combined, and conspired with each other to fix, raise, maintain, and/or stabilize the prices of Airfreight Shipping Services by, *inter alia*, levying concerted and artificially inflated Surcharges, jointly agreeing to eliminate or prevent discounting of prices of Airfreight Shipping Services, agreeing on yields, and allocating customers, routes, or territories.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff and the

other members of the Classes paid artificially high prices for Airfreight Shipping Services and have been damaged thereby.

64.     All Defendants are parties to all Counts alleged herein.

## UNNAMED CO-CONSPIRATORS

65.     At all relevant times, other Airfreight Carriers, trade groups, or other entities, referred to herein as John Does, as well as various other persons, companies, and corporations, the identities of which are presently unknown, willingly conspired with Defendants in their unlawful restraint of trade.

66.     The acts alleged herein that were done by each of the co-conspirators were fully authorized or ordered by each of those co-conspirators, or done by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

67.     All averments herein against any named Defendant are also averred against these unnamed co-conspirators as though set forth at length.

## AGENTS

68.     The acts alleged to have been done by any Defendant were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management of that Defendant's affairs.

## INTERSTATE AND INTERNATIONAL TRADE AND COMMERCE

69.     The global Airfreight Shipping Services industry involved $50 billion of business in 2005.  Approximately $19 billion of this commerce involved shipments to and from North America.  Shipments between North America and Europe constituted approximately $741 million of Airfreight Shipping Service commerce.  Airfreight Shipping Services is a business that has exhibited substantial growth in traffic, averaging

12

6.3% per annum from 2002 through 2005. In 2007, Airfreight Shipping Services industry was a $55 billion business and by 2008, it was projected to reach $57 billion.

70. Airfreight Shipping Services are a fungible, commodity product such that Airfreight Shipping Services provided by any one Airfreight Carrier are readily substitutable for the Airfreight Shipping Services provided by any other Airfreight Carrier. As a result, price is the primary factor driving customer choice between Airfreight Carriers.

71. Throughout the Class Period, there was a continuous and uninterrupted flow of transactions and shipments in Airfreight Shipping Services in interstate and international commerce throughout the United States and throughout the world, affecting trade therein.

72. Defendants' unlawful activities, as described herein, took place within and affected the flow of interstate commerce to Airfreight Customers located in states other than the states in which Defendants are located, as well as throughout the world, and had a direct, substantial, and reasonably foreseeable effect upon interstate and international commerce.

## CLASS ACTION ALLEGATIONS

73. Plaintiff is an individual residing at 507 Triadelphia Way, Alexandria, VA 22312. Plaintiff purchased Airfreight Shipping Services directly from Defendants Asiana Airlines and Korean Air and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

74. Plaintiff brings this action on her own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) on behalf of the following Class:

13

All persons and entities (excluding governmental entities, Defendants, and Defendants' respective predecessors, subsidiaries, affiliates, and business partners) in the United States that purchased Airfreight Shipping Services for shipments within, to, or from the United States directly from any of the Defendants, any co-conspirator, or any predecessor, subsidiary, or affiliate of each, at any time during the period from no later than January 1, 2000 to the present.

75.     Because such information is in the exclusive control of Defendants, Plaintiff does not know the exact number of the members of the U.S. Direct Purchaser Class. Due to the nature of the trade and commerce involved, however, Plaintiff believes that the members of the U.S. Direct Purchaser Class number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all members of the U.S. Direct Purchaser Class is impracticable.

76.     There are questions of law or fact common to the U.S. Direct Purchaser Class which will predominate over any questions that may affect only individual members, including:

a.     whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, and/or stabilize Airfreight Shipping Services prices charged in the United States and throughout the world;

b.     whether Defendants violated Section 1 of the Sherman Act;

c.     the duration of the conspiracy alleged in this Complaint;

d.     the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

e.     whether the conduct of Defendants, as alleged in this Complaint, caused injury to the businesses or property of Plaintiff and the members of the U.S. Direct Purchaser Class;

14

f.      the effect of Defendants' conspiracy on Airfreight Shipping Services prices charged in the United States and throughout the world during the Class Period;

g.      whether Defendants fraudulently concealed the alleged conspiracy so as to equitably toll any applicable statute of limitations;

h.      whether damages can be shown on a class-wide basis;

i.      the appropriate measure of damages sustained by Plaintiff and members of the U.S. Direct Purchaser Class; and

j.      whether the Class is entitled to injunctive relief to prevent the continuation or furtherance of the violations of Section 1 of the Sherman Act alleged.

77.     Plaintiff is a member of the Class having directly purchased Airfreight Shipping Services from one or more of the Defendants.

78.     The prosecution of separate actions by individual members of the U.S. Direct Purchaser Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

a.      The Class is readily definable and one for which records should exist in the files of Defendants.

b.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

c.      Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously,

efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

        d.    Class treatment will permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint on an individual basis.

        e.    This class action presents no difficulties of management that would preclude its maintenance as a class action.

    80.    Plaintiff's claims are typical of the claims of other U.S. Direct Purchaser Class members.

    81.    Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation and who will fairly and adequately protect the interests of the members of the U.S. Direct Purchaser Class.

    82.    Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class with respect to the subject matter of this litigation.

## DEFENDANTS' PRICE-FIXING SCHEME

    83.    Beginning no later than January 1, 2000 and continuing through the present, Defendants engaged in an ongoing conspiracy to fix, raise, maintain, and/or stabilize prices of Airfreight Shipping Services.

    84.    Defendants fixed, raised, maintained, and/or stabilized the prices of Airfreight Shipping Services through a number of mechanisms, including concertedly levying inflated Surcharges, jointly agreeing to eliminate or prevent discounting of Airfreight Shipping Services prices, agreeing on yields, and allocating customers, routes, or territories.

85.     The surcharge mechanisms, including Fuel Surcharges, Security Surcharges, War Risk Surcharges, and U.S. Customs Surcharges, were used by Defendants to collusively increase prices.

### Fuel Surcharge

86.     Beginning in at least late December 1999, Defendants exchanged information regarding a variety of Surcharges, including the Fuel Surcharge, in furtherance of their agreement to act in concert with one another to fix the overall prices of Airfreight Shipping Services.

87.     Generally, Surcharges are part of the price of Airfreight Shipping Services, whereby Airfreight Carriers such as Defendants charge extra fees to their customers, above and beyond basic freight charges typically priced by weight or volume, with the purported intent of defraying certain external costs of the Airfreight Carriers, but with the intended overall effect of increasing Airfreight Shipping prices.

88.     At the time the conspiracy commenced, many airlines had similar Fuel Surcharge pricing systems in place -- some of which were published -- which, if independently implemented in a competitive market, would have been the foundation for the timing and amount of upward or downward pricing movements triggered by multiple factors, including spot fuel prices.

89.     To eliminate competition in setting the Fuel Surcharge portion of Airfreight Shipping Services prices, Defendants combined and conspired, through secret meetings and communications, to jointly agree on the factors triggering each pricing system, the resulting price change to be implemented upon the occurrence of those factors, and the timing of that change. These meetings, communications, and agreements

17

ensured that Defendants would jointly act upon those triggering factors and identify and correct deviations from the terms and timing on which they collusively agreed.

90.     Among other things, Defendants agreed on harmonization of the Fuel Surcharge, implementation of the Fuel Surcharge, extensions of the Fuel Surcharge, currency issues, capping the Fuel Surcharge (by shipment or by weight), and refusing to discount the Fuel Surcharge to freight forwarders.

91.     Defendants also implemented their agreement by privately exchanging price and cost information for the purpose of monitoring and enforcing any agreed-upon Fuel Surcharge levels and publicly announcing agreed-upon Fuel Surcharge increases in advance of their implementation in order to ensure coordination among Defendants on the Fuel Surcharge levels.

92.     In 2002, Defendants jointly agreed to and initiated a four-step Fuel Surcharge increase program, where increase factors would trigger only one step per period, at $.05 increase per step, capped at the fourth step.

93.     By the end of 2003 or beginning of 2004, these increase factors triggered the fourth and final step of Defendants' four-step program. Defendants met to jointly agree on additional steps to implement price increases in concert beyond the original four-step program.

94.     As a result, Defendants jointly imposed additional, multiple-step price increases, all at identical amounts per step. All additional steps were preceded by multiple meetings, communications, and agreements among Defendants concerning such increases.

95.     As the conspiracy progressed, Defendants intensified their joint meetings, communications, and agreements regarding price increases.  Secret meetings and communications included discussions at the highest levels of the respective companies and occurred in various venues, including Europe, the United States, South America, and Asia.  These contacts often were initiated when one Defendant's methodology suggested an increase.  At such times, the initiating Defendant would contact the other Defendants to seek reassurances that all Defendants would adopt the same increase.  Defendants also sought reassurances to apply the Fuel Surcharge increases consistently throughout all world regions.

96.     Where the Fuel Surcharges were not being applied consistently, Defendants often undertook corrective action in order to ensure consistent application.

97.     During this period, Defendants concertedly policed one another's compliance with their joint price agreements and, among other things, secretly met and communicated about compliance with their agreements.

## Security Surcharge

98.     In addition to increasing prices of Airfreight Shipping Services through Fuel Surcharges, Defendants agreed to and did jointly increase prices through a Security Surcharge.

99.     Following the September 11 attacks, Defendants met, communicated and jointly agreed to impose the Security Surcharge upon their Airfreight Customers, which remained in effect thereafter.  Secret meetings and communications included discussions at the highest levels of the respective companies and occurred in various venues, including Europe, the United States, and Africa.

19

100.    Defendants jointly acted in order to facilitate agreements regarding exceptions, discounting, and caps relating to the Security Surcharge.

101.    Defendants, with few exceptions, jointly implemented the agreed upon Security Surcharge worldwide.

102.    The Security Surcharge imposed by Defendants bore little or no relationship to external costs. As of December 5, 2005, for example, the prevailing Security Surcharges were set at a uniform $0.15, regardless of differences in actual security costs for different localities.

### War Risk Surcharge

103.    Following the outbreak of the war in Iraq in 2003, Defendants again met, communicated, and jointly agreed to further increase prices of Airfreight Shipping Services by imposing on their Airfreight Customers another Surcharge: the War Risk Surcharge.

104.    Secret joint meetings, communications, and agreements specifically addressed individual Defendants' agreements concerning, and implementation of, the War Risk Surcharge.

105.    The War Risk Surcharge was terminated by Defendants approximately one month after its implementation.

### U.S. Customs Surcharge

106.    Beginning around late 2003, Defendants met, communicated, and jointly agreed to further increase prices of Airfreight Shipping Services through a U.S. Customs Surcharge.

107.    Since 2003, Airfreight Carriers have been required to prepare and submit to U.S. Customs a manifest of all goods that the carrier will offload in the United States.

This manifest, originating from the Airfreight Customer, must be received by the Airfreight Carrier and then submitted electronically to U.S. Customs by the Airfreight Carrier before its airplane enters United States airspace.

108.    During this period, Defendants secretly met, communicated, and jointly agreed to charge uniform flat fees to Airfreight Customers for each Defendant's preparation and submission of these manifests. These secret meetings and discussions occurred in Europe, Asia, and elsewhere. Defendants concertedly agreed that they would charge Airfreight Customers a flat fee of 8 Euros per manifest received from the Airfreight Customer in a manual or paper format, and 2 Euros per manifest received in electronic format.

109.    These U.S. Customs Surcharges were jointly implemented by Defendants beginning in August 2004 and continued thereafter.

### Defendants' Concerted Refusal to Discount

110.    Airfreight Carriers historically and typically allow freight forwarders a discount on Airfreight Shipping Services secured by the freight forwarder.

111.    During the Class Period, Defendants met, communicated, and jointly agreed to increase Airfreight Shipping Services prices by concertedly refusing to pay certain discounts to freight forwarders with respect to Airfreight Shipping Services.

112.    As a result of these secret meetings and communications, Defendants collusively agreed to refuse to provide discounts to freight forwarders with respect to the Surcharges on Airfreight Shipping Services.

### Defendants' Concerted Increases in Yields

113.    Data available to all Airfreight Carriers show yields for the industry as a whole.

114.    In furtherance of their Agreement, Defendants privately exchanged individual Airfreight Carriers' yields.

115.    During the Class Period, Defendants met, discussed, and jointly agreed to concertedly increase their yields on Airfreight Shipping Services.

### Defendants' Allocation of Customers

116.    During the Class Period, Defendants met, communicated, and jointly agreed to increase, maintain, and/or stabilize Airfreight Shipping Services prices by allocating their Airfreight Customers where necessary in order to minimize a customers' ability to access competitive rates.

117.    In furtherance of their conspiracy to increase Air Shipping Services prices during the Class Period, Defendants, at times, jointly and secretly agreed to and did refrain from pursuing and/or acquiring each others' customers.

### Defendants' Intent

118.    All Defendants' wrongful acts complained of herein were done knowingly, intentionally, purposefully, and willfully, and were carried out with knowledge of and willful disregard of the rights of Plaintiff and the Classes they represent, in a calculating fashion and/or with the expectation of profiting therefrom in an amount exceeding the amounts payable by them to Plaintiff and the Classes as a result of such wrongful actions.

### VIOLATIONS ALLEGED

119.    During the Class Period, the exact dates being unknown to the Class, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the prices of Airfreight Shipping Services and to allocate customers, in the United States and throughout the

22

world, through the means described in this Complaint in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

120.    In formulating and effectuating the alleged contract, combination, or conspiracy, Defendants engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the prices of Airfreight Shipping Services.

121.    During the Class Period, Defendants sold Airfreight Shipping Services in a continuous and uninterrupted flow of interstate and foreign commerce. Defendants received payment for such products across state and national boundaries. Defendants' activities, and the sale of their services, have both taken place within, and have had a substantial anticompetitive effect upon, interstate commerce within the United States and foreign commerce.

122.    Defendants' anticompetitive activities and their effects are in violation of the Sherman Act.

123.    Defendants' anticompetitive activities both inside the United States and in foreign nations have caused injury to Plaintiff and the Class.

124.    Plaintiff and the Class seek treble damages for their injuries, injunctive relief, and any such other relief that the Court deems necessary and appropriate.

## FRAUDULENT CONCEALMENT

125.    Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiff and the Class.

126.    Plaintiff and members of the Classes did not discover and could not have discovered, through the exercise of reasonable diligence, which they in fact exercised, the existence of the conspiracy alleged herein until February 2006, when the investigations

23

by the U.S. Department of Justice and other foreign antitrust regulators became public, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their conspiracy.

127.    Because Defendants' conspiracy was actively concealed until February 2006, Plaintiff and members of all Classes were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for Airfreight Shipping Services.

128.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

129.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

130.    Defendants met and communicated secretly concerning the pricing and marketing of Airfreight Shipping Services so as to avoid detection.

131.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

132.    Defendants gave false and pretextual reasons for their Surcharges during the Class Period.

133.    Each of Defendants' Surcharge announcements during the Class Period constituted implicit statements that the Surcharges in question were legitimate and the result of legitimate competitive market forces.  Surcharges for Airfreight Shipping Services before the Class Period had occurred and were publicly reported in press

24

releases, news wire services, trade publications, and newspapers. Plaintiff was thus conditioned by experience in dealing with Defendants in what Plaintiff believed to be a competitive industry to expect such Surcharges from time to time. However, any Surcharge that was openly collusive would not have been tolerated by Plaintiff.

134.    The Surcharges in question announced by Defendants and reported in public sources were consistently ascribed by Defendants and others to normal market forces and considerations, including increases in costs. Plaintiff and members of the Classes also did not have and could not have had contemporaneous access to sufficient information regarding Defendants' costs and thus had to rely on the truthfulness of Defendants' purported cost justifications.

135.    As an example, JAL Cargo posted on its website an explanation of Fuel Surcharges and Security Surcharges (what it called "Insurance Surcharges") that attributed them solely to rising costs and did not disclose that they were set collusively. The current version of this web page is found at
<http://www.jal.co.jp/en/other/info2006_0714.html>.

136.    Similarly, Cargolux's website has a page tying fuel Surcharges to upward or downward fuel costs, which does not disclose the conspiratorial nature of the mechanism for setting the Surcharges. The current version of this web page is found at
<http://www.cargolux.com/Customers/Surcharge.php>.

137.    Likewise, SAS Cargo attributed Security Surcharges primarily to cost factors without identifying the conspiracy relating to it. The current version of its website devoted to this topic is found at <http://www.sascargo.com/SASCargo/Fuel-surcharge.aspx>.

138.    At its website, British Airways has also attributed Fuel Surcharges to cost factors, with no reference to its collusive activities. The current web page on this topic is found at <http://www.baworldcargo.com/surcharges/>.

139.    KLM and Air France have issued press releases during the Class Period announcing Fuel Surcharge increases purportedly on the basis of rising costs; in none of these was the collusive mechanism used to set those Surcharges disclosed. Examples can be found at

http://www.klmcargo.com/tds/frameset.jsp?http&&&www.klmcargo.com/tds//newspage/news/KLMCargoadaptsfuelsurchargemechanismandincreasesfuelsurchargetoEuro035.jsp?ComponentID=58583&SourcePageID=9062>, <http:// www.airfranceklm-finance.com/sysmodules/RBS_fichier/admin/forcedownload.php?id=375 - >, and <www.af-klm.com/cargo/b2b/cargo_en/images/FSC%20AFKL%20-%200,50%20English_060131_tcm230-41568.pdf >.

140.    Similar pretextual announcements have been made during the Class Period by Defendants, including Singapore Airlines (<http://www.findarticles.com/p/articles/mi_m0CWU/is_2005_July_8/ai_n14729796>), Alitalia (<http://www.rte.ie/business/2005/0711/altalia.html>), ANA (<http://www.finanznachrichten.de/nachrichten-2006-09/artikel-6927521.asp>), and Lufthansa (<http://findarticles.com/p/articles/mi_m0CWU/is_2005_Sept_16/ai_n15397423>). These are only a few examples among many. Other Defendants made misleading announcements of the same type during the Class Period.

141.    These false or misleading explanations for Surcharges lulled Plaintiff into believing that increases were the normal result of competitive market forces rather than the product of collusive efforts. Defendants' statements to the media, to customers, and to analysts about the reasons for such Surcharges were designed to, and did, put Plaintiff and members of the Classes off guard and cause them to accept the increases without undertaking further inquiry. Even had such inquiry been undertaken, it would have proven futile, because Plaintiff and members of the Classes did not have access to contemporaneous information that would have allowed them to evaluate whether each Defendant's claimed justifications for Surcharges were valid.

142.    At the time, Plaintiff considered Defendants' articulated reasons for their Surcharges during the Class Period to be both normal and legitimate. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' Surcharges.

143.    Plaintiff and members of the Classes could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers concerning the reason for price increases and surreptitious communications among Defendants by the use of the telephone or in-person meetings at trade association gatherings (and elsewhere) in order to prevent the existence of written records.

27

144.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until February of 2006, Plaintiff and the members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed.

145.    None of the facts or information available to Plaintiff and members of the Classes prior to February of 2006, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to February of 2006.

146.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims of Plaintiff and members of the Classes as a result of the anticompetitive conduct alleged in this Complaint.

## AMNESTY RECIPIENT

147.    On or before December 31, 2005, Deutsche Lufthansa AG and Lufthansa Cargo AG approached the U.S. Department of Justice ("DOJ"), which has "a policy of according leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions."

148.    Lufthansa made an application under the DOJ's Corporate Leniency Policy on behalf of Deutsche Lufthansa AG, Lufthansa Cargo AG, Swiss International Air Lines Ltd., and any subsidiaries, to report price-fixing activity and/or other conduct potentially violative of Section 1 of the Sherman Act, 15 U.S.C. § 1, in the air cargo industry in the United States and elsewhere.

149.  Based on their report to the DOJ and consistent with and pursuant to the DOJ leniency policy, Lufthansa was accepted into the leniency program and extended full federal government immunity for the reported price fixing activities.

## INJURY TO PLAINTIFF AND THE CLASS

150.  The combination and conspiracy alleged herein had the following effects, among others:

a.  The prices charged by Defendants to, and paid by, Plaintiff and members of the Class for Airfreight Shipping Services were fixed, raised, maintained, and/or stabilized at artificially high and non-competitive levels;

b.  Plaintiff and members of the Class have been deprived of free and open competition in the purchase of Airfreight Shipping Services in the United States and worldwide;

c.  Plaintiff and members of the Class were required to pay more for Airfreight Shipping Services in the United States and worldwide than they would have paid in an competitive marketplace absent Defendants' price-fixing conspiracy; and

d.  Competition in the sale of Airfreight Shipping Services has been restrained, suppressed, or eliminated.

151.  During the Class Period, Defendants' Airfreight Shipping Services conspiracy as described herein caused Plaintiff and the members of the Class to pay artificially inflated prices for Airfreight Shipping Services they would not have paid absent such violations.  As a result, Plaintiff and the members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

29

152.    As a direct and proximate result of Defendants' illegal conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in that they have paid artificially inflated prices during the Class Period that they would not have paid in the absence of the illegal conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure;

B.    The Court adjudge and decree that the contract, combination, and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.    Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and the Class for damages as allowed by law as determined to have been sustained by them;

D.    Each of the Defendants, their successors, assigns, parents, subsidiaries, affiliates, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining, or renewing the combinations, conspiracy, agreement, understanding, or concert of action, or adopting any practice, plan, program, or design having a similar purpose or effect in restraining competition;

E.    The Court award Plaintiff and the Class attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

30

F.     The Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate;

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  March 20, 2009

Respectfully submitted,

COHEN MILSTEIN SELLERS
& TOLL PLLC

By: _____

J. Douglas Richards (JR-6038)
150 East 52nd Street
Thirtieth Floor
New York, New York  10022
Telephone:  212-838-7797
Facsimile:  212-838-7745
drichards@cohenmilstein.com

Daniel A. Small
Besrat J. Gebrewold
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005-3964
Telephone:  202-408-4600
Facsimile:  202-408-4699
dsmall@cohenmilstein.com
bgebrewold@cohenmilstein.com

*Counsel for Plaintiff*

31